**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION**

| | |
|---|---|
| BRANDON ZOLYNSKY and LINDSEY ZOLYNSKY, individually and as parents and natural guardians of the minor children, E.Z. and J.Z.,<br><br>Plaintiffs,<br>v.<br><br>BUFFUM BUILDERS LLC, d/b/a BUFFUM HOMES, NORMAN BUFFUM, and JOSHUA BUFFUM,<br><br>Defendants. | Case No. 26-3292 |

**COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

Plaintiffs Brandon and Lindsey Zolynsky ("Plaintiffs" or "the Zolynskys"), individually and as parents and natural guardians of their two young children with disabilities, bring this fair housing action against Defendants Buffum Homes ("Buffum"), Norman "Norm" Buffum, and Joshua "Josh" Buffum (collectively, "Defendants").

## NATURE OF THE ACTION

1. This action, pursuant to the federal Fair Housing Act and the Michigan Persons with Disabilities Civil Rights Act, seeks declaratory and injunctive relief and damages for discrimination on the basis of disability. Specifically, Defendants—custom home builders—refused to build a home for the Zolynsky family because of the disability-related needs of two of their children.

2. The Zolynskys currently reside in Wyoming, Michigan, in a neighborhood they love, but in a house that, as is, is inadequate to meet their family's long-term accessibility needs.

Two of their three children, E.Z. and J.Z., have significant developmental, motor, and cognitive disabilities that substantially limit several major life activities, and as such are persons with disabilities entitled to protection under the federal Fair Housing Act and the Michigan Persons with Disabilities Civil Rights Act.

3. To accommodate their family of five into the future, including the two wheelchairs that E.Z. and J.Z. utilize, the Zolynskys will need to acquire an oversize vehicle. They identified a modified Ford Transit XLT (extended cab) van ("Van") as being most appropriate for those needs. Because the Van will not fit through a standard residential garage door opening, the Zolynskys will need to live somewhere with a custom garage. The garage will facilitate indoor transfers so that E.Z and J.Z. are not subjected to the elements or to unnecessary health and safety risks every time the family leaves the house (and especially in winter months, when extreme cold and ice or snow can be dangerous).

4. In April 2026, the Zolynskys began communicating regularly with representatives from custom home builder Buffum Homes about building a custom, fully accessible home—including attached garage—for the family in "Kingsfield Estates," an extension of the Zolynskys' current neighborhood that Buffum was in the midst of developing. According to the company website, Buffum "excels at building high-quality, fully custom houses that prioritize your best interests"[1] and believes "that your dream home should be as unique as you are."[2] The Zolynskys explained to Defendants that two of their children had disabilities, and that the only reason they were interested in building a custom home was to meet the unique, disability-related needs of their children.

---

[1] *About Us*, Buffum Homes, https://buffumhomes.com/ (last visited Nov. 6, 2026).
[2] Buffum Homes, https://buffumhomes.com/about/ (last visited Nov. 6, 2026).

5. The Zolynskys repeatedly stressed their need for a custom, larger-than-standard garage that would accommodate the Van. For example, in an April 17 text message sent to Buffum Homes sales advisor Luke Gutbrod, Mr. Zolynsky wrote that the family needed "a 24' deep garage with a 10' high overhead garage door." Because the Zolynskys did not yet possess the Van, however, they did not know the precise minimum garage specifications that they needed.

6. By April 28, the Zolynskys had determined that, of the remaining Kingsfield Estates lots available, Lot #21, at 5532 Case Drive SW, Wyoming, Michigan, would best meet their family's needs and budget. On a call with Mr. Gutbrod and Buffum Homes vice president Josh Buffum that morning, the Zolynskys once again raised their need for a larger-than-standard garage. For the first time, Defendants indicated a limitation on garage door height, stating that they approved of garage doors only up to 9' high, then revising that a couple hours later to a maximum 9'3" and urging the Zolynskys to determine the Van's exact height.

7. Under pressure from Defendants to reserve Lot #21, and with the understanding that the details of the build itself would be settled in good faith and be based on their family's actual disability-based needs, the Zolynskys signed the standard Buffum Homes land contract on April 28, 2026, and paid the required $12,000 deposit. This contract did not address architectural details such as garage door height.

8. In the days following the signing of the contract, in an effort to honor Buffum's parameters while ensuring that their own disability-based needs were met, the Zolynskys consulted several overhead door companies, builders, and adaptive vehicle providers regarding the garage door clearance necessary for the Van. They uniformly were advised that 10' high clearance was needed.

9. In a May 5, 2026, meeting at Buffum's office, and again via email in the ensuing days, the Zolynskys formally reiterated their request for a 10' overhead garage door to meet the family's disability-based needs. In response, Josh Buffum likened their request for accommodation, to meet the needs of their two children with significant disabilities, to frivolous preferences, such as a client who has a pet tiger or who wants a pink house. In a May 7 email, Mr. Gutbrod wrote that the family's goals "would be difficult to accomplish…in this neighborhood" and unilaterally cancelled the land contract.

10. In phone calls on May 11 and 12 with Mr. Zolynsky, the latter of which was recorded, Norm Buffum doubled down on his company's refusal to continue working with the Zolynskys. As Mr. Zolynsky attempted to explain their request was one for reasonable accommodation, Norm Buffum repeatedly interjected and said, "Do you want to make me build you a home? That's not really a good basis for doing a construction relationship." He described the family's request as one for "monstrosity doors that look awful from the curb and just don't look very continuous or harmonious with the neighborhood…It's just, simply put, I don't want to have in my neighborhood 10-foot-tall doors."

11. Still hoping to work with Buffum Homes and stay in their neighborhood, the Zolynskys sought support from the Fair Housing Center of West Michigan ("FHCWM"). On the Zolynskys' behalf, a FHCWM representative explained to Defendants the fair housing requirements under federal and Michigan law and how Defendants' actions could violate those requirements. In response, Defendants doubled down on their refusal to work with the Zolynskys.

12. The Zolynskys' experience with Buffum Homes started as excitement at the prospect of building a fully accessible "forever home" in their existing neighborhood, keeping

their existing routines, schools, and services. But when Defendants made clear that they prioritized aesthetics over accessibility, it morphed into uncertainty, worry, and grief. Since Defendants' rejection, the Zolynskys have continued their search for a long-term home for their family, a process that has been mentally and physically taxing. Remaining in Kent County is critical because the family depends on complex county-facilitated care systems for E.Z. and J.Z. There are very few other vacant lots where a custom house could be built to meet the family's needs, budget, and geographic constraints. This particular housing opportunity, for this particular family, is irreplaceable.

13. Defendants' actions constitute unlawful discrimination in violation of the federal Fair Housing Act, 42 U.S.C. § 3604, *et seq.*, and the Michigan Persons with Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1501, *et seq.* This conduct has caused substantial and ongoing harm to Plaintiffs.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 because it arises under the laws of the United States. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

15. Venue is proper in this District under 28 U.S.C. § 1391(b) because the events and omissions giving rise to Plaintiffs' claims occurred in this District and Defendants appear to reside in this District.

## PARTIES

16. Brandon and Lindsey Zolynsky are the parents and natural guardians of E.Z. and J.Z. The Zolynsky family resides together in Wyoming, Michigan. E.Z. and J.Z. have significant and lifelong developmental, motor, and cognitive disabilities that substantially limit several

major life activities, and as such are persons with disabilities entitled to protection under the federal Fair Housing Act and the Michigan Persons with Disabilities Civil Rights Act. Mr. and Mrs. Zolynsky are intimately involved in their children's upbringing and medical care. By virtue of their association with E.Z. and J.Z., Mr. and Mrs. Zolynsky have been injured by Defendants' discriminatory acts and therefore are aggrieved persons within the meaning of the Fair Housing Act and buyers associated with persons with disabilities under the Michigan Persons with Disabilities Civil Rights Act.

17. Buffum Builders LLC, d/b/a Buffum Homes, is a custom residential construction company. Upon information and belief, Buffum Homes is a limited liability corporation with its principal place of business at 144 44th Street SW, Grand Rapids, Michigan.

18. Norman "Norm" Buffum is the president and owner of Buffum Homes.

19. Joshua "Josh" Buffum is the vice president of Buffum Homes.

## FACTUAL BACKGROUND

### A. Introduction

***The Zolynsky Family***

20. Plaintiffs Brandon and Lindsey Zolynsky have lived with their three young children, E.Z., L.Z., and J.Z., on Versatile Ct SW in Wyoming, Michigan since 2023.

21. E.Z. is Plaintiffs' nine-year-old son. Due to a rare genetic disorder, he has significant physical and mental disabilities and requires a wheelchair, other mobility and care equipment, and total care. E.Z.'s medical conditions qualify him as a person with a disability pursuant to the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, and the Michigan Persons with Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1103 *et seq.*

22. J.Z. is Plaintiffs' five-year-old daughter. Due to a rare genetic disorder, she has significant physical and mental disabilities and requires a wheelchair, other mobility and care equipment, and total care. J.Z.'s medical conditions qualify her as a person with a disability pursuant to the Fair Housing Act, 42 U.S.C. § 3601 *et seq*., and the Michigan Persons with Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1103 *et seq.*

23. The Zolynskys love the location of their current home for its sense of community, walkability, and proximity to all their children's schools and other local establishments. E.Z. and J.Z.'s school, which is one of two specialized learning centers serving all of Kent County, is only three miles away. J.Z. benefits from in-home therapy that is only available because they live within the radius of the provider. The family also depends on complex Kent County-facilitated systems of care for E.Z. and J.Z. that are based on their home address. But as is, their house is inadequate for E.Z. and J.Z.'s long-term accessibility needs.

24. E.Z., at age nine, weighs approximately 40 pounds and uses a wheelchair that weighs approximately 70 pounds. J.Z., at age five, weighs approximately 28 pounds and uses a wheelchair that weighs approximately 40 pounds. To enter their current home, Mr. or Mrs. Zolynsky must either carry E.Z. and J.Z. up two steps to the front door or three steps to the interior garage door. When the family is at home, the children's wheelchairs stay in the garage and the Zolynskys or other caregivers carry E.Z. and J.Z. from room to room. They must get the children ready for school in the garage, which is not climate controlled.

25. Nor will the Zolynskys' current family vehicle, a stock 2015 Toyota Sienna minivan ("Minivan"), meet their long-term needs.

26. When riding as a family in the Minivan, E.Z. and J.Z. must be secured in car seats set up in the two middle row captain seats. Mr. and Mrs. Zolynsky sit in the front. L.Z., age

seven, must sit in the back row, with the two seats next to her folded down to fit her siblings' wheelchairs. Already, this is a cramped arrangement.

27. Exiting the Minivan, even for a short amount of time, requires removing the two wheelchairs from the back of the vehicle, unfastening E.Z. and J.Z. from their car seats, moving them into their wheelchairs, and securing them there. As the children and their wheelchairs get bigger, this burdensome process will only become more so.

28. E.Z. has frequent yet unpredictable tonic-clonic seizures, which pose a serious risk of airway obstruction. He has had seizures while the family is driving in the Minivan. To care for their son during and after a seizure, Mr. or Mrs. Zolynsky (whoever is not driving) must unbuckle their own seat belt, climb into the middle seating area, and crouch beside E.Z. in his car seat, sometimes while the vehicle is still moving.

29. As the children and their wheelchairs get bigger, the Minivan will become even more unworkable.

30. To meet their longer-term daily living and transportation needs and accommodate all three of their children, including the wheelchairs used by E.Z. and J.Z., the Zolynskys intend to buy and modify a Ford Transit XLT (extended cab) van ("Van"). The Van will enable the whole family to ride together in safety and comfort. E.Z. and J.Z. will be safely secured in their wheelchairs, with one parent able to sit beside E.Z. in case of seizure. It will also have a motorized wheelchair lift, ramp, or other mechanism to simplify vehicle exits.

31. The Van is slightly over nine feet tall and thus too large to fit through a standard residential garage door opening, which is typically seven or eight feet high.

32. For E.Z. and J.Z., a garage that provides protected indoor access is a matter of health and safety, not just comfort. Michigan winters, with their snow, ice, rain, wind, and

extreme temperatures, can make unprotected wheelchair transfers and equipment handling hazardous for both the children and their caregivers. E.Z. and J.Z. are medically fragile. Temperature swings are especially dangerous for them and can trigger seizures in each. Given their children's health, the Zolynskys cannot move forward with obtaining the Van until they have a garage in which they can park it.

33. The Zolynskys were told that modification of their current garage to accommodate the Van would cost at least $80,000 and still potentially leave unnavigable barriers to entry into the house, such as the three steps between the garage and the living space. It would also require receiving a zoning exception from the city. They decided to pursue a custom home in large part to ensure a custom garage that would meet their family's disability-based needs.

***Buffum Homes***

34. Buffum Homes is a custom home builder that, upon information and belief, is a limited liability corporation with its principal place of business at 144 44th Street SW, Grand Rapids, Michigan. The company constructs approximately 25-30 homes per year.[3]

35. Norm Buffum is the president and owner of Buffum Homes. He has "over 35 years in the home construction and remodeling industry."[4] He is a licensed real estate salesperson.

36. Josh Buffum is the vice president of Buffum Homes and a son of Norm Buffum. Josh Buffum has "over a decade of experience in the construction industry."[5]

37. Luke Gutbrod is a sales advisor and employee of Buffum Homes. At all relevant times, Mr. Gutbrod was acting as an agent and employee of Buffum Homes and in the course

---

[3] Josh Buffum, *What "Custom" Really Means: Understanding the Types of Builders*, Buffum Homes (May 15, 2025), https://buffumhomes.com/types-of-home-builders-explained/.
[4] *About Us*, Buffum Homes, https://buffumhomes.com/ (last visited Nov. 6, 2026).
[5] *Id.*

and scope of his actual or apparent authority, or Mr. Gutbrod's acts or omissions were subsequently ratified and adopted by Buffum Homes as principal.

38. According to its website, Buffum Homes "excels at building high-quality, fully custom houses that prioritize your best interests."[6] It offers "fully customizable floor plans and personalized design services."[7] Defendants "believe that your dream home should be as unique as you are."[8]

39. Defendants advertise that Buffum Homes typically completes a custom build in six to ten months.[9]

40. Buffum Homes touts its commitment to meeting the needs of its customers in numerous blog posts: "While aesthetics and design preferences are important, it's essential to consider how the floorplan will fit your current lifestyle and accommodate your long-term needs…Each family and individual is unique, and what works for one person may not work for another."[10] And "We offer a wide range of proven floorplans that can be modified to fit your needs, or we can work with you on something more tailored…'Custom' doesn't mean much unless it comes with real flexibility—both in design and in execution."[11] Another post encourages clients to "Go Beyond the Basics & Get Creative," suggesting customizable features such as "[a] golf simulator room," "[a]n expansive concrete patio for summer nights," and "[a]

---

[6] Buffum Homes, https://buffumhomes.com/ (last visited Nov. 6, 2026).
[7] *Id.*
[8] *About Us*, Buffum Homes, https://buffumhomes.com/ (last visited Nov. 6, 2026).
[9] *Process*, Buffum Homes, https://buffumhomes.com/process/ (last visited Nov. 6, 2026).
[10] Buffum Homes, *What Style Home Works for Me?*, Buffum Homes (July 30, 2024), https://buffumhomes.com/what-style-home-works-for-me/.
[11] Josh Buffum, *What "Custom" Really Means: Understanding the Types of Builders*, Buffum Homes (May 15, 2025), https://buffumhomes.com/types-of-home-builders-explained/.

wrap-around porch for your morning coffee."[12] It also notes that "Aesthetics Matter, But Function Comes First."[13]

41. In another post, Defendants emphasize the garage as both a "[f]unctional and [p]ersonalized [s]pace," stating, "[W]e believe that if a finished garage is something that matters to you, it's worth it. Garages aren't just for cars—they can be tailored to fit your unique needs. Whether you see it as an organized storage space, a dedicated workshop, or even a home gym, we are here to help make that vision a reality…At Buffum Homes, we believe that every space in your custom home should reflect your unique lifestyle—even the garage. Let us help you make the most of it!"[14]

42. Testimonials from "Happy Homeowners" posted on Defendants' website show that other Buffum clients experienced the true flexibility of a custom build, as advertised. One client wrote, "We had the opportunity to build a home just the way we wanted it. We appreciated the opportunity to customize a floor plan and see our dreams come to a reality."[15] Another described how issues were resolved efficiently and respectfully, writing, "Anything I pointed out during the construction & final inspection was fixed promptly & without any arguments. Change requests were handled efficiently & had minor impacts on scheduling. Mostly I enjoyed working with the Buffum people, who were professionals & treated us with respect."[16]

---

[12] Buffum Homes, *How to Create Your Perfect Custom Home Floor Plan Design*, Buffum Homes (April 17, 2025) https://buffumhomes.com/custom-home-floor-plan-design/.
[13] *Id.*
[14] Buffum Homes, *Garages Aren't Just for Cars: Transforming Your Garage into a Functional and Personalized Space*, Buffum Homes (Oct. 8, 2024), https://buffumhomes.com/garages-arent-just-for-cars-transforming-your-garage-into-a-functional-and-personalized-space/.
[15] Buffum Homes, https://buffumhomes.com/ (last visited Nov. 6, 2026) (under "Testimonials: Hear From Happy Homeowners").
[16] *Id.*

**B. The Zolynskys Enter into a Contract with Buffum Homes for Lot #21**

43. Defendants are the owners and developers of Kingsfield Estates, 25 lots that form an extension of the Zolynskys' present neighborhood. By spring 2026, most lots had either already been sold or had "SPEC homes"[17] built on them.

44. In early March 2026, Mr. Zolynsky completed the intake form on Defendants' website. In response to the prompt, "The most important things my next home needs," he wrote, "Accessibility." In response to a prompt about "Deal-Breakers," he wrote, "a garage large enough with a large enough opening that will accommodate a full-size van with the tall roof."

45. Around April 14, 2026, the Zolynskys began communicating regularly with Buffum Homes employees, Mr. Gutbrod and Josh Buffum, about the prospect of building a custom, fully accessible home for the family in Kingsfield Estates.

46. The Zolynskys had been pre-approved for a $650,000 home loan and relayed this information to Defendants, who assured them that Buffum Homes would be able to sell them a lot and build them a custom home in Kingsfield Estates within their budget. Buffum Homes also offers its own favorable financing options, which the Zolynskys intended to utilize. Consistent with Defendants' business model, the Zolynskys understood that they would be responsible for all costs of construction, including the costs of a custom garage.

47. Early in their communications, the Zolynskys explained to Mr. Gutbrod and Josh Buffum that two of their children have significant disabilities and use wheelchairs. In an in-person meeting with Mr. Gutbrod on April 20, the Zolynskys emphasized that the only reason

---

[17] According to the Buffum Homes website, these are "move-in-ready or near-complete homes crafted with the same care and quality as our custom builds." Buffum Homes, *Why a SPEC Home Might Be the Perfect Fit for You*, Buffum Homes (July 17, 2025), https://buffumhomes.com/why-a-spec-home-might-be-the-perfect-fit-for-you/.

they were interested in building a custom home was to meet the disability-related needs of their children.

48. The Zolynskys also made clear to Mr. Gutbrod and Josh Buffum that, due to their children's disabilities, they needed a custom, larger-than-standard garage that would accommodate the Van. For example, in an April 17 text message sent to Mr. Gutbrod, Mr. Zolynsky wrote that the family needed "a 24' deep garage with a 10' high overhead garage door."

49. By April 28, the Zolynskys had determined that, of the remaining lots available, Lot #21, at 5532 Case Drive SW, would best meet the family's needs and budget. Lot #21 is just a 0.4 mile-walk away from the Zolynskys' current residence.

50. Defendants had previously filed paperwork with the city to build a SPEC home on Lot #21. While they made clear to the Zolynskys that it was not an issue to cancel the plans for the SPEC home, they pressed the Zolynskys to act quickly to reserve Lot #21. As Mr. Gutbrod wrote on April 28, "We just got that building permit for the SPEC this afternoon, so it [signing the contract and paying the deposit] will need to be asap."

51. On a call with Mr. Gutbrod and Josh Buffum that morning, the Zolynskys once again raised their need for a larger-than-standard garage. For the first time, Defendants indicated a limitation on garage door height, stating that they approved of garage doors only up to 9' high and urging the Zolynskys to determine the Van's exact height.

52. The online manual for the Ford Transit XLT lists the vehicle's height as approximately 107.7 inches, or just under 9 feet.[18] Descriptions of the vehicle elsewhere,

[18] *2026 Ford Transit Technical Specifications*, https://www.fromtheroad.ford.com/content/dam/fordmediasite/us/en/library/2026/specs/2026_Ford_Transit_Specs.pdf (last visited Nov. 9, 2026).

however, list heights of 109.6 and 110.4 inches, or up to 9’2.4”, depending on the configuration. Because the Zolynskys did not yet possess the Van, they did not know its exact height, or the precise, minimally necessary garage door clearance to accommodate it.

53. Mr. and Mrs. Zolynsky communicated with Mr. Gutbrod and Josh Buffum several times on April 28. In an email sent at 1:15pm, the Zolynskys referenced the slightly varied descriptions of the Van’s height and wrote, “we would be most comfortable if the garage door/opening height could accommodate up to 10 feet, or if the contract language could otherwise state that the garage will be designed to accommodate the anticipated accessible vehicle height and clearance needs. This is one of the most important considerations for the entire project.” In a phone call around 2:30pm and via email at 2:45pm, Defendants expressed that they would build a garage with doors up to 9’3” in height, based on the advice of their “overhead door guy” and aesthetics. That same afternoon, Mr. Zolynsky went to the local Ford dealership and measured the height of a standard model of the Van as 9’0.25”. Updating Mr. Gutbrod of this by phone around 3:10pm, Mr. Zolynsky reiterated his concern that a garage door of 9’3” would not be tall enough to accommodate the Van.

54. Under pressure from Defendants to reserve Lot #21 that day, and with the understanding that the details of the build itself would be settled in good faith and be based on their family’s actual disability-based needs, the Zolynskys signed the standard Buffum Homes land contract (“Contract”) around 4:30pm on April 28, 2026, for a purchase price of $120,000. They paid the deposit of $12,000.

55. The Contract states that the seller “is selling lot as a custom home build-to-suit project.” And further, that “[t]he buyer and seller agree to execute a new home construction contract no later than September 1st, 2026,” and that “[t]he parties mutually agree, each in good

faith, to take all steps reasonably necessary to facilitate the purchase and sale as contemplated in this Agreement and execute such documents reasonably necessary to carry out, and otherwise put into effect, the terms and provisions hereof."

56. The Contract does not address architectural details such as garage door height.

57. In the days following the signing of the contract, in an effort to honor Defendants' parameters while ensuring their own disability-based needs were met, the Zolynskys consulted several overhead door companies, builders, and adaptive vehicle providers regarding the exact height and clearance necessary for the Van. They uniformly were advised that modification would not change the height of the Van, and that 10' high clearance was needed.

**C. Defendants Discriminate on the Basis of Disability**

58. On May 5, 2026, the Zolynskys met in person with Josh Buffum and Mr. Gutbrod. At this meeting, and again via email in the ensuing days, the Zolynskys formally reiterated their request to Defendants for a 10' overhead garage door as a reasonable accommodation to meet the family's disability-based needs.

59. During the May 5 conversation, Josh Buffum likened the Zolynskys' request for accommodation, to meet the needs of their two children with significant disabilities, to frivolous preferences, such as a client who has a pet tiger or who wants a pink house. He explained that a similar "accommodation" for a large boat or RV would not be approved, either. Instead of granting their reasonable accommodation, Josh Buffum suggested that the Zolynskys could let some of the air out of the Van's tires to park the Van in the garage. Defendants again said that "aesthetics" were the primary reason they would not consider a 10' garage door.

60. Kingsfield Estates is a development of custom homes. A house with a larger-than-standard garage door, to accommodate a family already living in the neighborhood, would in no way fundamentally change the character of the neighborhood.

61. In a May 6 email sent to Josh Buffum and Mr. Gutbrod, the Zolynskys noted that, at Defendants' behest, they had contacted numerous vehicle modification companies, and the recommendations they received were all for a 10' garage door opening. They then wrote, "we continue to have significant concern that 9 feet 3 inches will not be sufficient to meet the long-term accessibility needs of our family with a future vehicle. Can you please let us know what additional information you would need from us to continue problem-solving and collaboration, or what functional alternative Buffum would propose to address the clearance concern?"

62. In Defendants' May 7 response, Mr. Gutbrod wrote that "[d]uring our most recent meeting, you gave use a new request to consider a 10' tall garage door." Citing "consistency with the architectural standards and overall character of the development," the email states that this request was "beyond what we believe is feasible within the constraints of the development and the overall direction of the project…We appreciate and understand some of the goals that you have for your family but sincerely feel that it would be difficult to accomplish those goals in this neighborhood." The email closes by stating that Buffum Homes would be mailing the Zolynskys' deposit back in full and "wrapping up the file promptly."

63. The Zolynskys responded by email on May 8, asking for clarification as to "what specific development constraints, project direction, neighborhood goals, or other barriers would prevent a 10' overhead garage door or a reasonable functional alternative from being considered for our family's accessibility needs."

64. Defendants did not respond to this email, but on May 11, Norm Buffum called Mr. Zolynsky. Mr. Buffum said that, while he understood that the family had a lot of needs, any garage door beyond nine feet in height would not meet the architectural appeal and the "look" his company was going for in Kingsfield Estates. This was the Zolynskys' first interaction with Norm Buffum.

65. Following this call, Mr. Zolynsky sent an email to Norm Buffum, Josh Buffum, and Mr. Gutbrod confirming the Zolynskys' understanding of Defendants' "basis for the proposed closure of the contract": the garage needs of the family "would not align with the architectural appeal, aesthetics, overall cohesive appearance intended for the development, and that this would make it difficult to maintain the look that Buffum is going for with this neighborhood."

66. Defendants did not respond to this email, but on May 12, Norm Buffum again called Mr. Zolynsky. This call is recorded. There, Mr. Buffum adamantly refused to continue working with the Zolynskys. Citing his own "general architectural guidelines," he told Mr. Zolynsky, "Maybe you're a better fit, with your circumstances to be…where you don't have that scrutiny and that detail where you can put a 12-foot door in if you need a bigger vehicle later or something."

67. After Mr. Zolynsky noted that the apparent sticking point was only "a matter of nine inches," Norm Buffum began repeatedly pressing Mr. Zolynsky for his "end game." As Mr. Zolynsky attempted to explain their request was one for reasonable accommodation, Mr. Buffum repeatedly interjected and said, "Do you want to make me build you a home? That's not really a good basis for doing a construction relationship." When Mr. Zolynsky replied that his goal was to "advocate for my family and put us in a position where we can have a home that meets our

needs in the area that is well suited for us to have a quality of life and have our care [] needs met…which is in that location [Kingsfield Estates Lot #21],” Mr. Buffum said curtly, “[a]nd that won’t happen in my neighborhood.”

68. Norm Buffum’s tone grew increasingly frustrated over the course of the call. At one point, he stated, “if I can address the elephant in the room, we are not discriminating against your family or your circumstances or your situation at all.” He then described the Zolynskys’ request for accommodation as one for “monstrosity doors that look awful from the curb and just don’t look very continuous or harmonious with the neighborhood…It’s just, simply put, I don’t want to have in my neighborhood 10-foot-tall doors.”

69. Also on May 12, Defendants posted a blog on their website telling their potential customers that “[b]uilding a custom home is an exciting opportunity to create a space that truly reflects the way you live…a beautiful home means very little if it does not function well for your everyday life.”[19]

70. Still hoping to find a way to work with Buffum Homes and stay in their neighborhood, the Zolynskys sought support from the Fair Housing Center of West Michigan (“FHCWM”).

71. On the Zolynskys’ behalf, FHCWM enforcement coordinator Rebecca Nespital sent Defendants a letter on June 1, 2026, that explained fair housing requirements under federal and state law and how Defendants’ actions could violate those requirements. The FHCWM letter included as attachments two letters from medical providers of E.Z. and J.Z. that attest to the children’s disabilities and the necessity of protected garage access.

[19] Buffum Homes, *How to Design a Home That Fits Your Lifestyle, Not Just Trends*, Buffum Homes (May 12, 2026), https://buffumhomes.com/how-to-design-a-home-that-fits-your-lifestyle-not-just-trends/.

72. In a June 12 recorded phone call with Ms. Nespital, Norm Buffum refused once again to move forward with the Zolynskys. When Ms. Nespital asked whether there was "a possibility to re-up this contract in any way or work with the family," he replied, "I don't like what this feels like…If you and I were partners in Buffum Homes and this is how the relationship starts, would you actually want to build a house for a family that this is how the relationship starts?" At least three times, Norm Buffum referenced the FHCWM letter itself as a reason not to move forward. He said, "Anytime anybody mentions fair housing, you know, in this situation [it's intimidating]…I'm…really upset to even get the letter."

73. Defendants responded to FHCWM in writing on June 12 and did not change their position. The short letter characterized the situation as a mutual breakdown based on aesthetic details rather than a refusal to accommodate the family's disability-related needs, stating: "Ultimately, the parties were unable to reach agreement regarding certain other requested design details and architectural considerations for a possible home building project."

74. Defendants have not identified any written architectural guidelines that would preclude a 10' tall garage door as a matter of course.

75. Defendants have never indicated that a 10' tall garage door would undermine the structural integrity of the building or create permitting issues.

76. Defendants have never indicated that they or their contractors lacked the technical capability or building materials to build a structurally sound garage with a 10' tall garage door.

77. Defendants have never explained why nine more inches beyond the 9'3" garage door they had approved on April 28 would be "infeasible," apart from references to aesthetics and neighborhood "look."

78. Upon information and belief, no municipal zoning regulations in Wyoming would prevent the construction of a 10' garage door.

79. Kingsfield Estates does not have a homeowners' association that imposes rules or standards on the houses within the development.

80. A document posted on the Buffum Homes website called "Building Restrictions for Kingsfield Estates" lists the "protective covenants, restrictions and conditions upon the use of lots" in the development. With respect to garages, it states simply that "[e]ach dwelling shall not have less than an attached two-stall garage" and that "[n]o recreational vehicles…vans (other than mini-vans), or snowmobiles shall be parked or stored on the public streets of the project, nor parked in any driveway or kept in any garage if such storage would prevent full closure of the door thereto, for more than three (3) days without written approval of the Developer."[20]

81. By these terms, a full-size van such as the Van ordinarily *must* be parked behind a closed garage door for any length of time beyond three days.

82. As of this filing, Defendants' website still lists Lot #21 as available.

**INJURY TO PLAINTIFFS**

83. As a result of Defendants' unlawful actions, Plaintiffs have suffered, continue to suffer, and will in the future suffer economic damages. The Zolynskys have been forced to continue their search for a long-term home for their family, a process that has been mentally and physically taxing. Lot inventory in Kent County that could meet the family's needs, budget, and geographic constraints is extremely limited. The cost of any replacement lot on which they could build a fully accessible home will likely be higher. Their future construction costs will likely be

[20] *Building Restrictions for Kingsfield Estates* ¶ 25, https://buffumhomes.com/wp-content/uploads/Kingsfield-Restrictions.pdf (last visited Nov. 6, 2026).

higher than in summer 2026, and they are unlikely to receive as favorable financing as available through Defendants in summer 2026.

84. As a result of Defendants' unlawful actions, Plaintiffs have suffered, continue to suffer, and will in the future suffer, loss and injury, including, but not limited to emotional distress, dignitary harm, humiliation, embarrassment, and a deprivation of their right to equal housing opportunities without regard to disability status as protected under state and federal law.

85. The Zolynskys' experience with Buffum Homes started as excitement at the prospect of building a fully accessible "forever home" in their existing neighborhood. But when Defendants made clear that they prioritized aesthetics over accessibility, it morphed into uncertainty, worry, and grief. Defendants' treatment of their family, up to and including Defendants' refusal to recant their unilateral contract cancellation, has caused Plaintiffs emotional distress. For one or both, Defendants' conduct has caused stress, sleep loss, headaches, anxiety, stress eating, or decreased appetite.

86. The Zolynskys are deeply concerned about remaining close to all their children's schools and support systems. In their existing neighborhood, the family can safely walk, play, ride bikes, and push wheelchairs on the sidewalks of flat and quiet residential streets. Mr. and Mrs. Zolynsky can walk their daughter L.Z. to a school where she has close friends and their family is embraced. The family depends on complex county-facilitated care systems for E.Z. and J.Z, which relocation could disrupt or render unavailable.

87. Building their long-term home on Lot #21 would have kept the Zolynskys in a location that supports their quality of life, care needs, and community stability. Lot #21 was their only feasible opportunity to live in a fully accessible home in the same walkable neighborhood,

surrounded by supportive neighbors and friends. This particular housing opportunity, for this particular family, is irreplaceable.

88. Defendants knew that E.Z. and J.Z. had disabilities, and acted intentionally and willfully, with callous and reckless disregard for Plaintiffs' statutorily protected rights.

## CAUSES OF ACTION

### Count I (Against All Defendants): Making Housing Unavailable in Violation of the Fair Housing Act, 42 U.S.C. § 3604(f)(1)

89. Plaintiffs repeat and incorporate by reference all allegations contained in paragraphs 1 through 88 as if fully set forth herein.

90. Plaintiffs' children E.Z. and J.Z. are disabled within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(h), because, as alleged herein, they have impairments which substantially limit one or more major life activities. E.Z. and J.Z. would have resided in a Buffum-built home on Lot #21 and, as the parents of E.Z. and J.Z., Plaintiffs are associated with people with disabilities.

91. Defendants unilaterally terminated Plaintiffs' contract, refused to continue negotiating, and ultimately refused to build a home for Plaintiffs on Lot #21 because of their family's disability-related needs. Defendants thus made housing unavailable, refused to negotiate for the sale of, and/or otherwise denied housing to Plaintiffs because of disability, in violation of 42 U.S.C. § 3604(f)(1).

92. Defendants' acts, policies, and practices in violation of the Fair Housing Act caused Plaintiffs' injuries as detailed above.

**Count II (Against All Defendants):**
**Discriminatory Terms and Conditions in Violation of the Fair Housing Act,**
**42 U.S.C. § 3604(f)(2)**

93. Plaintiffs repeat and incorporate by reference all allegations contained in paragraphs 1 through 92 as if fully set forth herein.

94. Plaintiffs' children E.Z. and J.Z. are disabled within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(h), because, as alleged herein, they have impairments which substantially limit one or more major life activities. E.Z. and J.Z. would have resided in a Buffum-built home on Lot #21 and, as the parents of E.Z. and J.Z., Plaintiffs are associated with people with disabilities.

95. At all relevant times, Defendants were aware of the disabilities of Plaintiffs' children and were aware that Plaintiffs' customization requests arose from their family's disability-related needs.

96. Defendants are custom homebuilders that provide individualized, customized, and/or made-to-order homes, but Defendants refused to build a home for Plaintiffs on Lot #21 that was customized to meet their family's disability-related needs.

97. In denying Plaintiffs the customization they offer to other buyers, Defendants discriminated on the basis of disability in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, in violation of 42 U.S.C. § 3604(f)(2).

98. Defendants' acts, policies, and practices in violation of the Fair Housing Act caused Plaintiffs' injuries as detailed above.

**Count III (Against All Defendants):**
**Denial of Reasonable Accommodation in Violation of the Fair Housing Act,**
**42 U.S.C. § 3604(f)(3)**

99. Plaintiffs repeat and incorporate by reference all allegations contained in paragraphs 1 through 98 as if fully set forth herein.

100. Plaintiffs' children E.Z. and J.Z. are disabled within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(h), because, as alleged herein, they have impairments which substantially limit one or more major life activities. E.Z. and J.Z. would have resided in a Buffum-built home on Lot #21 and, as the parents of E.Z. and J.Z., Plaintiffs are associated with people with disabilities.

101. At all relevant times, Defendants were aware of the disabilities of Plaintiffs' children and were aware that Plaintiffs' design requests arose from their family's disability-related needs.

102. Plaintiffs sought a reasonable accommodation to afford them equal opportunity to use, enjoy, and live in a dwelling in Kingsfield Estates: Due to their children's disabilities, Plaintiffs asked Defendants to build them a home with a ten-foot-high garage door.

103. The requested accommodation—changing the garage door height for one home in a development of custom homes—would not have been an undue financial burden, an undue administrative burden, or a fundamental alteration, nor would the accommodation have intruded upon the rights of third parties.

104. Defendants refused to build Plaintiffs a home with a garage door that met their family's disability-related needs and thus denied Plaintiffs a reasonable accommodation in violation of 42 U.S.C. § 3604(f)(3)(B).

105. Defendants' acts, policies, and practices in violation of the Fair Housing Act caused Plaintiffs' injuries as detailed above.

**Count IV (Against All Defendants):**
**Discriminatory Statements in Violation of the Fair Housing Act, 42 U.S.C. § 3604(c)**

106. Plaintiffs repeat and incorporate by reference all allegations contained in paragraphs 1 through 105 as if fully set forth herein.

107. Plaintiffs' children E.Z. and J.Z. are disabled within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(h), because, as alleged herein, they have impairments which substantially limit one or more major life activities. E.Z. and J.Z. would have resided in a Buffum-built home on Lot #21 and, as the parents of E.Z. and J.Z., Plaintiffs are associated with people with disabilities.

108. Defendants Josh Buffum, Norm Buffum, and Buffum Homes (by and through its agents) made statements to Plaintiffs that their family's disability-related needs were not compatible with the neighborhood, referred to their requested garage door as a monstrosity, and compared their requests to frivolous hypotheticals, among other statements.

109. Defendants thus made statements with respect to the sale of a dwelling that indicate a preference, limitation, or discrimination based on disability status, in violation of 42 U.S.C. § 3604(c).

110. Defendants' statements in violation of the Fair Housing Act caused Plaintiffs' injuries as detailed above.

**Count V (Against All Defendants):**
**Interference and/or Retaliation in Violation of the Fair Housing Act, 42 U.S.C. § 3617**

111. Plaintiffs repeat and incorporate by reference all allegations contained in paragraphs 1 through 110 as if fully set forth herein.

112. Plaintiffs' children E.Z. and J.Z. are disabled within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(h), because, as alleged herein, they have impairments which substantially limit one or more major life activities. E.Z. and J.Z. would have resided in a

Buffum-built home on Lot #21 and, as the parents of E.Z. and J.Z., Plaintiffs are associated with people with disabilities.

113. Plaintiffs exercised their rights protected by the Fair Housing Act by seeking a reasonable accommodation and by indicating, both directly and through others, that refusal to permit a ten-foot-tall garage door constituted discrimination on the basis of disability.

114. By terminating Plaintiffs' contract, refusing to continue negotiating, and refusing to build a home for Plaintiffs on Lot #21 because of their reiterated requests for a reasonable accommodation, and efforts by Plaintiffs and others to make Defendants aware of their fair housing obligations and violations, Defendants retaliated against Plaintiffs because of complaints and/or reports of a discriminatory housing practice and interfered with Plaintiffs' exercise or enjoyment of rights granted and protected by 42 U.S.C. § 3604, in violation of 42 U.S.C. § 3617.

115. Defendants' acts in violation of the Fair Housing Act caused Plaintiffs' injuries as detailed above.

**Count VI (Against All Defendants):**
**Denial of Reasonable Accommodation in Violation of the Michigan Persons with Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1506a**

116. Plaintiffs repeat and incorporate by reference all allegations contained in paragraphs 1 through 115 as if fully set forth herein.

117. Plaintiffs' children E.Z. and J.Z. are disabled within the meaning of the Persons with Disabilities Act, Mich. Comp. Laws § 37.1103(d) and (h), because, as alleged herein, they have impairments which substantially limit one or more major life activities. E.Z. and J.Z. would have resided in a Buffum-built home on Lot #21 and, as the parents of E.Z. and J.Z., Plaintiffs are associated with people with disabilities.

118. At all relevant times, Defendants were aware of the disabilities of Plaintiffs' children and were aware that Plaintiffs' design requests arose from their family's disability-related needs.

119. Plaintiffs sought a reasonable accommodation to afford them equal opportunity to use, enjoy, and live in a dwelling in Kingsfield Estates: Due to their children's disabilities, Plaintiffs asked Defendants to build them a home with a ten-foot-high garage door.

120. The requested accommodation—changing the garage door height for one home in a development of custom homes—would not have been an undue financial burden, an undue administrative burden, or a fundamental alteration, nor would the accommodation have intruded upon the rights of third parties.

121. Defendants refused to build Plaintiffs a home with a garage door that met their family's disability-related needs and thus, in connection with a real estate transaction for Lot #21, refused to make reasonable accommodations in rules, policies, practices, or services, when such accommodations were necessary to afford Plaintiffs equal opportunity to use and enjoy residential real property, in violation of the Michigan Persons with Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1506a(1)(b).

122. Defendants' acts in violation of the Michigan Persons with Disabilities Civil Rights Act caused Plaintiffs' injuries as detailed above.

**Count VII (Against All Defendants):**
**Making Housing Unavailable in Violation of the Michigan Persons with Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1502(1)(a) and (d)**

123. Plaintiffs repeat and incorporate by reference all allegations contained in paragraphs 1 through 122 as if fully set forth herein.

124. Defendants unilaterally terminated Plaintiffs' contract, refused to continue negotiating, and ultimately refused to build a home for Plaintiffs on Lot #21 because of their family's disability-related needs.

125. Defendants thus refused to engage in a real estate transaction with Plaintiffs and/or otherwise refused to negotiate for a real estate transaction with Plaintiffs on the basis of disability, in violation of Mich. Comp. Laws § 37.1502(1)(a) and (d).

126. Defendants' acts in violation of the Michigan Persons with Disabilities Civil Rights Act caused Plaintiffs' injuries as detailed above.

**Count VIII (Against All Defendants):**
**Discriminatory Terms and Conditions in Violation of the Michigan Persons with Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1502(1)(b)**

127. Plaintiffs repeat and incorporate by reference all allegations contained in paragraphs 1 through 126 as if fully set forth herein.

128. Plaintiffs' children E.Z. and J.Z. are disabled within the meaning of the Persons with Disabilities Act, Mich. Comp. Laws § 37.1103(d) and (h), because, as alleged herein, they have impairments which substantially limit one or more major life activities. E.Z. and J.Z. would have resided in a Buffum-built home on Lot #21 and, as the parents of E.Z. and J.Z., Plaintiffs are associated with people with disabilities.

129. At all relevant times, Defendants were aware of the disabilities of Plaintiffs' children and were aware that Plaintiffs' customization requests arose from their family's disability-related needs.

130. Defendants are custom homebuilders that provide individualized, customized, and/or made-to-order homes, but Defendants refused to build a home for Plaintiffs on Lot #21 that was customized to meet their family's disability-related needs.

131. In denying Plaintiffs the customization they offer to other buyers, Defendants discriminated on the basis of disability in the terms, conditions, or privileges of a real estate transaction or in the furnishing of facilities or services in connection with a real estate transaction, in violation of Mich. Comp. Laws § 37.1502(1)(b).

132. Defendants' acts in violation of the Michigan Persons with Disabilities Civil Rights Act caused Plaintiffs' injuries as detailed above.

**Count IX (Against All Defendants):**
**Discriminatory Statements in Violation of the Michigan Persons with Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1502(1)(f)**

133. Plaintiffs repeat and incorporate by reference all allegations contained in paragraphs 1 through 132 as if fully set forth herein.

134. Plaintiffs' children E.Z. and J.Z. are disabled within the meaning of the Persons with Disabilities Act, Mich. Comp. Laws § 37.1103(d) and (h), because, as alleged herein, they have impairments which substantially limit one or more major life activities. E.Z. and J.Z. would have resided in a Buffum-built home on Lot #21 and, as the parents of E.Z. and J.Z., Plaintiffs are associated with people with disabilities.

135. Defendants Josh Buffum, Norm Buffum, and Buffum Homes (by and through its agents) made statements to Plaintiffs that their family's disability-related needs were not compatible with the neighborhood, referred to their requested garage door as a monstrosity, and compared their requests to frivolous hypotheticals, among other statements.

136. Defendants made statements or made a record of inquiry in connection with a prospective real estate transaction, which indicate an intent to make a limitation, specification, or discrimination with respect to a real estate transaction on the basis of disability, in violation of Mich. Comp. Laws § 37.1502(1)(f).

137. Defendants' statements in violation of the Michigan Persons with Disabilities Civil Rights Act caused Plaintiffs' injuries as detailed above.

**Count X (Against All Defendants):**
**Retaliation, Discrimination, and/or Interference in Violation of the Michigan Persons with Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1602**

138. Plaintiffs repeat and incorporate by reference all allegations contained in paragraphs 1 through 137 as if fully set forth herein.

139. Plaintiffs exercised their rights protected by the Michigan Persons with Disabilities Civil Rights Act and opposed a violation of the Michigan Persons with Disabilities Civil Rights Act by seeking a reasonable accommodation and by indicating, both directly and through others, that refusal to permit a ten-foot-tall garage door constituted discrimination on the basis of disability. In response, Defendants made discriminatory statements, terminated Plaintiffs' contract, refused to continue negotiating, and ultimately refused to build a home for Plaintiffs on Lot #21.

140. Defendants thus retaliated or discriminated against Plaintiffs because they opposed a violation of, and/or interfered with Plaintiffs in the exercise or enjoyment of their rights protected by the Michigan Persons with Disabilities Civil Rights Act, in violation of Mich. Comp. Laws § 37.1602(a) and (f).

141. Defendants' acts in violation of the Michigan Persons with Disabilities Civil Rights Act caused Plaintiffs' injuries as detailed above.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiffs pray that this Court grant judgment in their favor, and against Defendants, as follows:

a) Enter a declaratory judgment that the foregoing acts by Defendants violated Plaintiffs' rights under the federal Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, and the Michigan Persons with Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1501 *et seq.*;

b) Permanently enjoin Defendants from engaging in illegal discriminatory conduct on the basis of disability in their residential construction business;

c) Award compensatory damages to Plaintiffs in an amount to be determined by a jury that would fully compensate Plaintiffs for the economic loss and emotional distress caused by the conduct of Defendants alleged herein;

d) Award punitive damages to Plaintiffs in an amount to be determined by a jury that would punish Defendants for their willful, callous, wanton, and reckless disregard for Plaintiffs' rights, and that would effectively deter Defendants from engaging in similar conduct in the future;

e) Award Plaintiffs any and all costs and/or fees incurred in this action that are available under law; and

f) Order such other relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues triable as of right.

Date: November 18, 2026

_/s/ Brenna Kearns_
Brenna Kearns (DC Bar # 1725241)
Lila Miller (DC Bar # 1643721)
RELMAN COLFAX, PLLC
1225 19th St., NW
Suite 600
Washington, D.C. 20036
Tel: 202-728-1888
Fax: 202-728-0848
bkearns@relmanlaw.com
lmiller@relmanlaw.com

*Attorneys for Plaintiffs Brandon and Lindsey Zolynsky*